Okay, we will call our first case for this morning, which is Virgin Grand Estates v. Inter-Ocean Insurance Company. And we will begin with you, Mr. Barron. If please the court, my name is Ken Barron. I'm from Pittsburgh, with me is my co-counsel, Doug Chonko. Actually, I'm his co-counsel. I would like to reserve three minutes for rebuttal. Granted. Thank you. This is my 62nd oral argument today. Most of them have been involved with insurance issues, mainly in Pennsylvania State Court, but also in some federal courts across the country. In Pennsylvania, I'm known for the Rantkoski v. Washington National Decision before the Supreme Court, defining the definition of insurance bad faith. Because of that, Doug Chonko knows about me and asked me to come and help him on this case because of the insurance issues involved in this case. Now, last week at the bench bar conference, Chief Justice Robert gave a suggestion on oral argument. He said, identify the key cases, make it easy for the panel and identify what are the key documents. So right off the top, three key cases, Metro Transportation, they're all decisions of the Third Circuit, American Casualty and American Lumber and Manufacturing. Those are what we believe are three key cases. And the four key documents, we've provided copies for your honors. They're from the joint appendix. I'm also going to put them on the Elmo machine here and hopefully this works. And the first one is the cover page of the policy. Mr. Barron, so that Judge Smith knows as well, can you just give us the page from the joint appendix that you're referencing? Sorry, JA0629. Yes, this is the declaration page, Mr. Barron. That is correct. Thank you. And you have already anticipated a question for me. I believe you indicated that this is part of the policy. Is that correct? That is correct. Thank you. I'm going to zoom in on this. And all I wanted to bring your attention to, is first of all, the first name insured is Virgin Grand Estates. That's simple. The second is right below that, it says effective from February 1st, 2017 to February 1st, 2018, both days at 12.01 a.m. standard time. And right below that, it says insurance is effective with certain underwriters at Lloyd's London, percentage 100%. Now, one of the key issues in this case is what is meant by effective, and how does that relate to expiration dates? Well, defense would like to conflate the two concepts. Effective is a temporal expression, whereas when you expire or terminate a policy, that's an operative function. So there's two different concepts at play here. In other words, we have an effective time period, February 1st to February 1st. Now, I can give a quick analogy. It's like if you're at a store and you're shopping in the shopping hours from nine to five, and at five o'clock there's an announcement, the store will be closing or a few minutes beforehand. But if you're already in the store, you still get to keep shopping. And if you're in line to buy your merchandise at 5 p.m., they don't throw you out at 5 p.m. They don't say you're gone. They say that's your temporal period. All right, you've used the word temporal. Yes. And I will not quibble with you or argue with you that effective is temporal in nature, but doesn't it refer not to a span of time, but a particular point in time? Either something is effective or to the contrary, it is ineffective. This states it's effective. So doesn't that point us to precisely a point in time as seems to be referred to here by the next line, 12.01 a.m. standard time? It, like I said, provides a temporal time range. It does not provide the operational manner in how the policy will be terminated. That's described in the policy. Okay, within the terms of the policy, there are only four ways that this policy can be terminated and they're all in writing. Well, referring to that, you lean a lot on section four, which I mean IV, clause nine, which discusses expiration from an insured non-renewal. I'm sorry, an insurer's non-renewal. In other words, it starts if we decide not to renew, but you're trying to apply it to an insured non-renewal. Why should we read it that way? Not at all. And by the way, that is not. So explain to me, how is Lloyd's deciding not to renew? Oh, I'll move to the third. Well, first of all, we know paragraph nine says when we do not renew. And we is Lloyd's. And that they will mail or deliver to the first name insured notice of non-renewal and provide 30 days advanced notice. It says prior to expiration, the way you're reading it, non-renewal and expiration are the same. Why would they use two different terms? If we were to read it the way you propose, those terms mean exactly the same thing. No effective date and expiration are two different words. If Lloyd's wanted the effective date to be the end of the policy, they could have said so right in paragraph nine. They say, no, it's an expiration date. Something different than effective date. One thing that is obvious at the start in this case, at least at the start of reading the briefs is just how riddled it is with terms. Cancellation, termination, expiration, non-renewal, and I'll throw in lapse. Are these terms of art within the insurance business? That is correct, Judge Smith. They are terms of art and each hold different meanings. An expiration is a very specific event and how expiration occurs is not defined on the front page of the policy. All it provides is an operational definition of the policy. Then the policy inside itself provides the mechanism for how termination can occur. They call it expiration. If Lloyd's wanted this to be the expiration date right on the front page, they could have said effective from February 1st and expires on February 1st, 2018, or ends on or terminates. They do not use that word. They've been- If termination is a term of art that's not defined in the contract, what are you giving, what are you relying on to give content to expiration? Because otherwise we would just give it its ordinary common use meaning, which is typically an automatic ending of efficacy. But you're advocating for a different, as I understand it, industry term of art meaning of expiration. And if it's not defined in the contract, from where are you deriving this other definition? You have to go to the words and actions, which is our American Lumber and Manufacturing case, which is my next document, which is JA 1327, 1327, which is the liability renewal quote. And what is significant on this document, it provides an expiration date. If it automatically terminates, why would they create an expiration date? It's contradictory. So the effective date is not the expiration date. It's something different. They give an expiration date when they send the renewal quote out from, goes out from Red Hook to the broker and ultimately supposed to get to the insured. You've pointed us to this document. This is the January 10th, 2018 quote. Why doesn't this function as the notice you say was required? Because the policy says it has to go to the first named insured, period. No exception, no alteration, directly to the first name insured. It was never sent to the first named insured. Well, it doesn't say under all circumstances, it says if we non-renew, right? It's, this goes to Judge Chung's point that the two times there's this reference to notice as to non-renewal, it's under the terms of what the underwriter must do. Well, hang on. All right, let me answer that question. Go to the bottom of the page and they provide the language. This policy will be non-renewed if renewal has not been requested by the expiration date. The expiration date is defined as on this document, February 1st, 2018. They don't say by the effective date, they say by the expiration date, which is only the word expiration date only appears in that policy in paragraph nine, nowhere else. That seems to speak to the effect of not returning the form rather than a decision by Lloyd's. In other words, an insured's non-action will result in non-renewal rather than Lloyd's affirmatively deciding not to renew. And this document seems to suggest exactly the opposite that Lloyd's did choose to renew and that it was up to the insured to accept the offer. And if the insured failed to accept the offer, it would be the insured's non-renewal, not the insurer's non-renewal. The insured has no ability to non-renew. They can send a letter saying we no longer want insurance. That has to be in writing. What is going on here is this document is essentially saying we will accept your premium up until February 1st, 2018. If you pay us by then, we will renew the policy. But if you do not, we will no longer accept the premium payment after February 1st, 2018, and we will non-renew the policy. You now have 30 days before all the coverage is completely gone under section nine. That's reading a lot of words into this document that don't appear there. Why shouldn't we read this as a description of the consequence of the insured opting not to renew? Lloyd still has to make an affirmative decision to non-renew because of forfeiture law that the law abhors a forfeiture of coverage. So what do they do? They put in a specific clause in the policy when we choose not to renew. Otherwise the policy doesn't terminate by failure to pay a premium. It does not terminate that way. They have to, if that's the choice, they have to send a notice of cancellation and you have 10 days to pay a premium. It does not cancel on its own. There are only four ways. They're all in writing to the insured or from the insured to the company. Those are the only ways this type of policy terminates. You're not only cancellation, right? Your argument is as to the term non-renewal.  And the non-renewal occurred by the actions of the insurance company. This is what is known as a conditional non-renewal. The policy will be non-renewed if renewal has not been requested by the expiration date. No request was made by the insured by the expiration date. Therefore that triggers non-renewal action by Lloyd. Judge Smith, I think you had a question. No, I was going to say, in addition to putting a lot of words into this, as Judge Krause has pointed out, doesn't this result necessarily in our setting, in this case, as it has been pleaded, a period of insurance coverage for which no premium has been paid? And that is a good, yes. It is beyond what, excuse me for using the term, but it is beyond the expiration date of the policy. It is a business decision of Lloyd's to decide when they're going to non-renew. They could have sent a non-renewal notice 30 days before the effective date, and which would have then turned the effective date into the expiration date. They did not do that. They chose to renew with a conditional non-renewal. That protects Lloyd's as well as the insured. It works both ways. It protects Lloyd's because they have defined definitely, when does the policy end? 30 days non-renewal is the mechanism for ending the policy. 30 days comes with that business decision of Lloyd's. They choose when to set the expiration date. They choose when they should send the notice of non-renewal. They failed to ever send a notice of non-renewal to the insured. They violated the terms of their own policy. Mr. Barron, we're a little over time. I've got a couple of questions for you, and I'll see if my colleagues have additional questions. I wanted to confirm, since you don't address in your briefs, the discovery order, dismissal of the RICO claims, or the aiding and abetting claim, that you're no longer pursuing those on appeal? That is correct. We're no longer pursuing RICO.  May I also ask, just for contextual purposes, and to make sure I understand where all of us are procedurally, your client has been, do I understand correctly, fully compensated for its loss by virtue of the settlement with Inner Ocean? Not entirely. There's an issue of attorney's fees that are outstanding, and that also the Lloyds and Redhawk have the ability to seek attorney's fees, because under Virgin Islands law, there's fee shifting. So whoever is the winning party, plaintiff or defendant, can ask for fees. So we're asserting bad faith, and we can prove bad faith, but we were dismissed at a pleading phase, and now the person we're claiming bad faith is gonna ask us for thousands of dollars of attorney's fees to pay them for defrauding us.  So that also anticipates my follow-up question. So I was going to ask what relief you're seeking here, but in effect, this action is not only for purposes of adding relief your client would be seeking, but also for defensive purposes, for lack of putting it some other way. That is correct, Your Honor. All right, thank you. I'm sorry, Judge Krause. That's fine. I just have one follow-up. You stated that if Lloyds had provided notice 30 days before February 1st, 2018, then February 1st, 2018 would be the expiration date, not just the effective date. Correct. Since this was sent on, when I say this, I'm referring to the January renewal quote. Why doesn't this just make the expiration date February 10th, 2018? Never sent to the named insured. Direct violation of their own contractual terms. That's there to protect the insured in case notice doesn't get to them through some intermediary. They took care of that problem. We're gonna tell the insured directly, and we impose that obligation on ourselves. That's a Lloyds business decision, their choice of language, and those requirements are strictly construed under Third Circuit case law of Metro Transportation and American Casualty. What has been historically, or what had been historically, the course of dealing between these parties prior to the episode, or lack thereof, that led to this litigation? In the prior decade, this type of renewal notice would be sent, given to the broker, broker would pass it along to the named insured. So every year, the company first determines does it want to re-insure this risk, number one. Number two, then they let the broker know, well, the company lets the agent know, the agent lets the broker know, and the broker lets the insured know. It's a little bit convoluted process. It's a four-step process, but that convoluted or not, the real dealings have been conducted through the agency relationships between the parties here. Have they not been? I mean, through- That is correct. Yeah, through Red Hook in one instance, and also InterOcean. So- That is correct. So couldn't the requirement that you refer to, that notice be given directly to the insured, be overcome or preempted if the agency relationship between Virgin Grand and InterOcean was sufficiently broad? And maybe this is a hypothetical rather than what occurred here, because I don't think there's anything in the record to cover the facts as you are suggesting. But in any event, couldn't the agency include the obligation to give notice simply as between the two agents here and not directly to the insured Virgin Grand? Only if you want to overturn existing Third Circuit precedent. Those termination clauses are strictly construed by the Third Circuit and it's in these opinions through Metro Transport and American Casualty. It's strictly construed against the insurance company. They must comply verbatim with what they put in that policy. They cannot send it to any intermediary. It must be only to the first name insured, which is Virgin Grand Estates. There's no gray, it's black and white. Isn't the most you could hope from this appeal that we would conclude non-renewal is sufficiently ambiguous that extrinsic evidence would come into play and that would create a jury question, but that wouldn't result in a judgment automatically in your favor. That would then become a jury question. That is correct. And if we gave the impression we're thinking judgment in our favor, no, no. We think that the complaint, what we're saying was that the amended complaint should be permitted by the court at this point in time. Because in the amendment, we clarify the interplay of the non-renewal with the renewal. And then we had the testimony of Leroy Walker, who was a cover lawyer. And he testified that this is a non-renewal, which is when we first learned that during discovery. So yes, it's not something that should be decided at the pleadings phase. That really is a jury question. And that's what we are seeking. Let me ask you one other question as to your claims against Red Hook. Because as you make these arguments about them being your agent, about non-negligence and bad faith, what are the damages given that the revision, modification to make it a request for a new policy rather than a renewal is something that's taking place after the loss event in this case? The problem is that application was for a renewal. When they changed it to non-renewal, one, they violated Virgin Islands insurance law, which requires notification of any material alterations to an application. And number two, they're serving in a fiduciary capacity. They received a request for renewal. They rejected it and never told the first name insured, we're not doing this. We're issuing a new policy, which would then create the whole question that never occurred. Then the policyholder, Virgin Grant, could have said to Red Hook, what's going on? Why is this not a renewal? We did not realize there was any deficiency or any problem because every year we're told when to renew and how much to pay. We cannot set the payment. But the loss event had already taken place, right? In the interim. It had and no one understood the significance of the loss at that time. When questions were asked about the fall, the contractor said, oh, the guy was drinking. It's not so bad. They just sent him to the hospital checkup and he's okay. Two years later, a lawsuit gets filed. That's when everyone really became aware, uh-oh, what's going on here? The loss is your suggestion that Lloyds would have been open to retroactively continuing the prior policy through a retroactive renewal? No, that's what we learned between the original complaint, the first and the subsequent amended complaint. We understood what was going on. They already had decided this is a non-renewal based upon this policy will be non-renewed if renewal has not been requested by the expiration date. So no, no retroactive coverage. Renewal provides automatically the 30-day extension and the injury fell within that 30 days. You've referred to Virgin Islands law relative to renewal or non-renewal. You were referring, I'm assuming, to Section 826 of, I guess it's Title 22, the Virgin Islands Code, any insurance policy terminating by its terms that has specified expiration date and not otherwise renewable, maybe renewed or extended. Was that the Virgin Islands law you were referring to? That is not the one I was specifically referring to, but that is also applicable. I was referring to the Virgin Islands law section on applications. On 807, that's, all right, that's 807, the alteration of application, which I think even has criminal implications to it if pursued. Did you raise this at all, 807, in the Courtyard Law? Did you? Yes, sir. I hadn't seen that. All right, thank you. It's in the complaint. We pled it right into the complaint. All right. Any further questions? Not I. All right, then we'll hear. We'll hear from you in rebuttal. Thank you for taking the time for getting an understanding of it. Thank you.  Good morning. My name's Greg Mast, and I represent Underwriters at Lloyd's and Red Hook. We respectfully ask the court to affirm for three reasons. First, the policy expired under its terms. And second, something that wasn't discussed, the only remaining claim is for bad faith. And no matter what the court were to determine today, there is no argument that Underwriters' determination itself was unreasonable as a matter of law as necessary to trigger a bad faith claim under Virgin Islands Law. And third, Red Hook had no fiduciary relationship with Virgin Grand in an arm's length transaction. Your Honors. About the fiduciary relationship, so we can just get that out of the way. Under Virgin Islands Law, doesn't section two provide for that fiduciary duty? Well, it provides for a fiduciary duty between a retail agent and the insured. Here, Red Hook is one step removed. They're acting as a cover holder, which is outlined in great detail in the First Amendment Complaint, it's paragraphs 12 or 17, which outlined essentially that Red Hook has the pen. It acts for all intensive purposes as the insurer. It's what makes this case fundamentally distinguishable from the CEB decision, which is what Towers Condo, which is what appellants rely upon. There, there were four factors to consider. The first is, who called the broker into action? Here, Red Hook couldn't come into action, but for the fact that it had a cover holder agreement that it acted for Underwriters. I understood, but as to section two, by its own terms, it applies to all persons. And that includes the insurer and their representatives. Why would a cover holder be accepted? A cover holder is not accepted. It functions the same as the insurer. So whatever duties and obligations the insurer has, the cover holder would have as well. So I don't think it exempts them. They're acting in the same relationship and same capacity, but I'm not sure where else section two has been argued by appellants to expand the scope of the relationship. The relationship in Virgin Islands law has always been defined by the Towers Condominium decision. And Towers Condominium, what establishes the fiduciary relationship is the pattern and the actual, who calls them into responsibility, who calls them into action. Since we're talking about relationships here, in particular, fiduciary relationships and agency relationships, let me start with the obvious or my obvious assumption that Red Hook here was acting as an agent for underwriters, right? Yes, they had a cover holder agreement or written contract, which established that Red Hook could place risks on behalf of underwriters. All right, I'm probably giving away my patent ignorance about a lot of insurance issues, but I guess I have not in the past confronted the concept of sub-agency, which is argued by your friend on the other side, was Red Hook here acting as a sub-agent at any point or was anyone else acting as a sub-agent of underwriters? Well, so our argument, Your Honor, respectfully, is not that Red Hook was a sub-agent of underwriters, but rather that Red Hook was a sub-agent of InterOcean. So what I'm trying to do is suggest that Red Hook ultimately has ultimate responsibility to the insured, not just to underwriters. It's a dual agency. I misspoke and I did understand that to be the relationship, but what I'm actually inquiring into since I predicated this on my lack of an understanding of the concept is how can one be a sub-agent? How can Red Hook here be a sub-agent of InterOcean? And if so, how is that dual agency responsibility capable of fulfilling, being capable of fulfilling without some inherent conflict to it? It's perhaps a question just of curiosity, but it is a question that struck me. Yeah, so the Virgin Islands is unique, Your Honor. You do often have an entity that serves both as a retail agent and as a cover holder. So you may go to one agency and they may form both roles as they may hold the pen. It might be a particular person in the company that underwrites the risk. And so is there an inherent conflict of interest? Yes, but that's not this case, nor is it what was alleged. In paragraph 12 of the first amended complaint, it very clearly says that Red Hook acted, quote, as if they were a local insurer, end quote. Appellant's dual agency arguments are nothing but conclusions. They point to on page 45 of their brief, they cite extensively to the first amended complaint, paragraphs 25 to 27, 42 to 45, 71 to 73, 82 to 85, all to prove dual agency. The problem is not a single one of those paragraphs references Red Hook. They're all about interrotion. The only references to Red Hook that could potentially be, wow, bad pun, a hook for establishing dual agency are things such as paragraph 60. That says Red Hook performs underwriting reviews for underwriters. Paragraph 61, that Red Hook, that InterOcean issued the payment to Red Hook or Lloyds. These are all functions of which Red Hook is acting for underwriters at Lloyds. Paragraph 62, that Red Hook provided the notice for underwriters the policy would lapse. So again, Red Hook, all the allegations of the complaint related to Red Hook, despite the conclusion of dual agency, relate solely to Red Hook's actions on behalf of underwriters. When you say that they have pled merely a conclusion, what more should have been pled? I assume some particulars related to the scope of an agency or something other than the mere conclusion that there was an agency, some description of the relationship? Some description of the relationship, which establishes that Red Hook was acting for InterOcean, as opposed to in an arm's length transaction, being the representative of underwriters. And what you have here is InterOcean submitting an application for coverage, and Red Hook, as if it was underwriters at Lloyds, responding and addressing that request, performing the underwriting functions, deciding whether the risk is appropriate, deciding this is something that they want to ensure, all within the parameters of a cover holder agreement that otherwise defines what Red Hook's role and responsibility might be. And so to their credit, the first amendment complaint, paragraphs 11 and 12, outline in great detail the cover holder relationship. It's what makes this very clear that we don't have a Towers-Condo situation. It's what makes this case very clear that what we have here is an independent agent acting for the insurer. And so to come back to Judge Krause's question, that the issue isn't that Red Hook is somehow different, unique. It's just that Red Hook acts as if, and it's treated as if, it was the insurer. And in Virgin Islands law, draws a distinction between brokers and agents. It doesn't mean that they don't have obligations, but they're not fiduciaries in this scenario. The fiduciary obligation arises from a special relationship between parties. Here, we don't have that. And it's very clear under the four-factor test in CEB, or Towers-Condo, that none of those triggers are met. Let's go back to the breach of contract and good faith claims. There are a number of jurisdictions where notice is required no matter the basis for the non-renewal. There's the language to which your colleague has pointed us at the bottom of J1327, the January 10th renewal quote about this policy will be non-renewed if renewal has not been requested by the expiration date, which seems like it will be non-renewed, seems like referring to something that the insurer would do. Why isn't there enough ambiguity around the term non-renewal that extrinsic evidence would be appropriate for a fact finder to consider? So keeping in mind that because of the judgment satisfaction, all that's left, all the purported potential damage that could be recoverable relates to the bad faith claim, the court's constrained by Justin v. Guardian as well as the Worthington decision, where the courts in the Virgin Islands have been very clear that unless it could survive directed verdict, that is, unless the less directed verdict would be entered against the insurer, there can be no bad faith claim. So if your ultimate conclusion is that there's a question of fact, then the district court should be affirmed. But let's take a step back. The Virgin Islands is different. I point the court to 22 VIC section 826. Just to step back. So you then disagree with your colleagues' positions that in effect, what they're asking for is that this go for a jury trial on this question because there are disputed factual issues and extrinsic evidence could then come in. Your view is that the only way that there would be anything but an affirmed jury is in the case of a directed verdict? It is because all that remains by their own admission is the bad faith claim. That's the only thing for which they haven't been compensated. And so under Virgin Islands law, it's a very narrow inquiry. Again, Justin v. Guardian and the Worthington versus Uena agency cases are very clear that there's any question as to whether the insurer's conduct was reasonable, that in that scenario, the insurer's entitled to judgment as a matter of law. The court goes on in the Worthington decision to specifically say that what this effectively means is there would have to be directed verdict entered against the insurer to maintain a bad faith claim. If there's a question of fact, it's an affirmance. But you won't get anywhere near there because the policy is clear enough. The policy is very specific. But I wanna take a step back because you asked a really important question that really goes to the heart of this case. The Virgin Islands in 22 VIC 826, that's a statute that governs renewals. Unlike Pennsylvania, which we'll talk about and Metro Transport, there is no specific statute in the Virgin Islands that requires an insurer to give notice of a non-renewal simply when a policy expires or lapses. In Metro Transit, it was because of the Pennsylvania statute governing notice of regulation of taxi cabs. And so notice has to be given a form E to the Pennsylvania PUC. Right, but that obligation could be imposed by a statute or can be imposed by the policy itself. And there's language here that that notice would need to go to the first named insured. Respectfully, Your Honor, I can't find it. And they haven't pointed to a single case in which there was not a statute or where the insurer did not affirmatively decide to non-renew that notice was required. The cases on the other side are legion. We can talk about P&K versus P&K and JK versus Burlington Insurance Company. You have a Tane Insurance Company. You have versus Johnco, Claussen versus Genco, Saunders W Farms. And even the cases though, that talk about where there's a statute that they rely upon. The cases that they're relying very heavily upon draw this very clear distinction like State Farm versus O'Brien, which is the most frequently cited case in the appellant's brief. Who else could actually renew? I mean, the insured would be applying for renewal, but isn't it always the insurer that is deciding whether it will renew or not renew? Respectfully, no. The insured has just as much rights, if not more. The insured, just because an offer is made, the insured has no obligation to accept it. The insured can decide that the contract is being non-renewed. Clearly they don't have an obligation to accept it, but we're talking about how to interpret this term, non-renewal. And we're talking about it in the context of an insurance policy, a contract that has been drafted by your client that where there's ambiguity around it, we would be construing against your client, right? You would construe the ambiguity against our client, but this court has also said in the contracting decision that you shouldn't reach for an ambiguity. So the policy is very clear. It says, if we non-renew, if we, the insurer, non-renew, that's not what happened here. Whether we want to call what the insured did a non-renewal or not, I think is an interesting debate we could have. But what we do know is there was no non-renewal by the insurers. But let me also suggest that this is all a fool's errand anyways, because the policy effective dates has a very distinct and important purpose. The policy says in the insuring agreement, quote, this insurance applies to bodily injury only if, subparagraph two, bodily injury occurs during the policy period. The effective dates are the policy period. So in other words, even if the policy were extended, it has no consequence or no effect because the bodily injury still would have had to have occurred during the policy period. If the policy period were extended, then the loss here would have occurred during that period. Well, if you're extending the policy, you're extending the time in which claims can be made, but that doesn't change the policy term. The policy term is still set as a matter of the contract. And in the Virgin Islands, contracts with terms are enforced to that time period. That's Perez versus Ritz-Carlton. So there's an established body of case law, and I can't find a single case, ultimately, that supports the conclusion. A single case where there wasn't a statute or an obligation in the contract to provide notice. So they refer to American lumberman or the American casualty case. Those are group health policy in one case. The other, it was one where the insurer made material changes to the policy, triggering a non-renewal. Those are very different cases than we have here where the insurer says, we want to renew. And the first amended complaint, paragraph 74, this is their allegation. Lloyds was willing to renew. Lloyds was willing to renew. As of that date in 2017, the policy would expire. Expire, these are their words, their allegations. There was no allegation. Can you point us to a case that suggests that an insured can non-renew, that that term non-renewal is equally applicable to the decision of an insured as to an insurer, as opposed to non-renewal being something that only the insurer could do, which seems consistent with the way 1327 is written. So there is, to my knowledge, no case that uses the word non-renewal with regard to the insured. They say is they didn't accept the renewal or the policy lapsed, the policy expired, but those are distinctions without a difference. If that's the case and the term non-renewal is one that is an action only the insurer can take, then why aren't we just back to the terms of the policy that say that when we non-renew, when we the insurer non-renew, that's when notice is required. Because you can't impose upon the insurer an obligation to non-renew every single policy. That's what they're asking you to do. So where an insured says, I don't want the policy, that's honored, right? The insured has the right to say, we don't want the policy. It doesn't trigger an obligation by the insurer to non-renew. There's not a case in the country that I've been able to find or that they've cited to where there wasn't a statutory obligation or a specific provision in the policy that required notice from the carrier. Where the carrier has offered to renew and it is the insured's decision or failure to respond that results in the end of the policy term, every court has enforced that policy term. What they're asking this court to do would be a first of its kind and would turn centuries of insurance law on its head. Every insurance policy for which a carrier didn't issue a non-renewal would be deemed to have continued indefinitely. We would have policies from pre-World War I that would still be enforced today, covering losses, even though insured's never paid premiums as Judge Stitt points out. Why isn't this just up to the insurer in the drafting of its policy? And here it opted to draft it so that the notice would go to the first named insured. It could have drafted it and it did in other portions of the policy to say that notice in a different circumstance would go to either the insured or its representative. It didn't do that as to non-renewal. Why doesn't that make this policy the way Lloyd's has chosen to proceed? One that required notice to the insured and where it wasn't provided that non-renewal is not effective. So lots to unpack in that question. I think the starting point there needs to be that this is ISO or standard wording that's used across the country for commercial general liability policies drafted by the insurance service office. It's an approved form used and approved by most insurance commissioners. It's not a Lloyd's specific form. So there's no unique tweak we can make to that. Could every insurance policy anticipate every possible scenario? Yeah, we would have plaintiff's lawyers complaining that the policy is too long in every instance. What we have here is a very plainly, very clearly drafted language that says when we non-renew, when we make that decision and every court that's looked at it has come to the same conclusion. But you've told us there's no case that identifies non-renewal, that verb, with an insured. I'm not aware of a specific case that has gone. If there's something, if that's something that only the insurer can do and we have a policy where the drafter has chosen in certain places to say that notice will be provided to the first named insured and his representative, but as to the insurer's non-decision to non-renewal, that that is something that goes to the first named insured, why shouldn't we take that as the party's expectations and understanding? So the fundamental problem I have is I can't support the premise. The fundamental premise is that an insured can non-renew. Non-renew is not a term of art. It just means not renew the policy. An insured can do that. The fact that a case is just referred to it as lapse, well, that makes more sense because the insured isn't always saying, I don't want to renew it. And sometimes they're just not taking the actions necessary to renew it. And whether we treat that or call that a non-renewal, respectfully, I think that's lawyers playing games, parsing words. And while words matter, ultimately when we're looking at ambiguities, we're looking for what a reasonable insured and how a reasonable insured would look at the language. And that language very clearly says when we choose to non-renew. So- So it seems to me that really the thrust of your argument, the work is done by the word decide in clause nine or paragraph nine. In other words, if we decide not to renew, which means an affirmative choice by the insurer that after the effective date, they've opted not to undertake this risk. Whereas renew is just an event that happens. Renew or non-renew is, from what I understand of your argument, is just an event. And so the thing that really matters is if there's a decision by the insurer not to renew. And yes, your honor. And that was the holding of Clawson versus General Security, the holding of Sanders W Farm, the holding of Attain, as well as the holding of the Burlington Insurance Company decision on which the district court based its ruling. So in your argument is that the key is whether there has been a decision not to renew rather than the effect of non-renewal occurring? Well, I think for purposes of triggering the non-renewal clause, there has to be a decision. The effect though, where a policy holder doesn't respond is we can call it an expiration. We can call it a decision by the insured to non-renew. I think it's a distinction without a difference in this context. The policy, the contract ends. There is no continuation of the contract. It's a contract for term, which again under Perez versus Ritz-Carlton in the Virgin Islands means it ends under its own terms. What if JA 1327 had just never been sent? And so JA 1327, both parties seem to agree it reflects Lloyd's decision to offer a renewal. But what if that had just never been sent on February 2nd, 2018? What would, would there have been a decision not to renew on February 1st, 2018? So that very question was addressed in Clawson versus General Casualty decision from the District of Nebraska court in 2015. There the court addressing the exact same scenario said, quote, there is no evidence that the insurer decided not to renew the policy. Thus the provision requiring notice of non-renewal was never triggered. The policy simply expired, end quote. So that scenario has happened. And it does happen from time to time where the insured says, I didn't get the notice. The insured says- Was that decision based on Nebraska statutory language or upon the language of the policy? The language of the policy. And that is, comes back to the fundamental distinction is that every single case that has looked at this from a contractual point of view has found the insurer has no obligation to issue a notice of non-renewal in the absence of a statute or an absence of an automatic renewal provision or a court interpreting there being an automatic renewal provision within the policy. Not a single case they cite, not a single case. But the plaintiff could create that obligation, right? Your Honor, if you reached a way to try and create one, I don't know how you would because every court that's looked for it in this particular scenario has been unable to find it. The closest it's come, and this is again, this is a case they rely upon very heavily is State Farm versus O'Brien, which was an Arizona Court of Appeals case. Now, there we had an automobile policy. Automobile policies, as you can imagine, are often subject to automatic renewal clauses. In that context, the policy automatically renewed unless or as long as the insured paid the premium. Well, there the insured didn't pay the premium, but the court found that the combination of those clauses created an ambiguity. Explained, quote, this point is a significant distinction because it sets the instant policy apart from the ordinary term policy, which could expire without notice. The court then went on, I think very importantly though, to say something that's dispositive for this case. Quote, we acknowledge that the appellant's interpretation of the language of the policy is not completely without merit, end quote. In other words, under Justin Vigardian and other Worthington that wouldn't be, the insurer's position was not so unreasonable as to prevent judgment in their favor on a bad faith claim. Further questions, Judge Smith? No, thank you. Thank you. Thank you. Mr. Barrett, if there had been a notice in the January 10th renewal quote sent and there was an explicit response from your client that they did not wish to renew, would it be your position that there was some further requirement of a notice of non-renewal by Lloyds? No, because one of the four ways to cancel the policy is the insured provides notice to the company. We do not want to continue the coverage. That would fit that clause exactly to a T. Why isn't it simply implicit in the silence that that's the decision of the insured? Because there may not have been a communication to the insured. Remember each year, the company has to set a premium. It's not a guaranteed premium. It varies every year. So the company makes a decision. Do they want to accept the risk? And if they do, what do we want to charge for that risk? So they have two decisions they're making right there. They provide that then notice of we're willing to renew and this is how much it's going to cost you throughout the form, send us a check. But we're only going to accept the check until February 1st. After that, we non-renew the policy. That provides certainty to the insurance company, protects them. They have a cutoff date. You got 30 days, goodbye. That also eliminates any lawsuits against them because they're avoiding non-forfeiture of the coverage. They provided notice. They put it in writing to the insured and said you have your 30 days after which see you later. If we do this, then that happens. So it's an if and then situation. A decision is made on the non-renewal in this case, not until February 1st when the premium is not received we now non-renew the policy. Therefore we have certainty. If you made a goof or whatever, you're getting written notice saying goodbye. You now have to come back to us and ask us if you want a new policy or to renew the policy. And by the way, what happened here? We renewed the moment we got the check, the information just like we did every single year. And now they're trying to say, hey, we found a technical loophole maybe except then they ignored their own non-renewal provision in their policy. That's the only way they can reach the result by avoiding the actual language and their requirements and their policy. They avoided them, they made a mistake and now they want to shift it through legalese the other way saying effective is conflated to mean expire. Yet the policy on paragraph nine says expire. It does not say effective. And there are only four ways to terminate the coverage in the policy. What is your best case for the proposition that it is only the insurer that can non-renew and that that's something that takes place when there's not the receipt of a premium as opposed to the decision to non-renew being one that can be made by the insured as well as the insurer. The insured can non-renew by never sending a check back but that does not terminate coverage. The insurance company has to be proactive or the insured can be proactive by writing to the company saying we don't want any more coverage. If that does not occur, then the company has the obligation it took it on itself to send a notice of non-renewal because you didn't pay or they send a notice of cancellation because you did not pay. Either way written notice must be provided to the name insured, depending on which one's either 10 day notice or 30 day notice. Here it's a non-renewal, excuse me, renewal so it's a 30 day notice. The cancellation usually applies where it's a monthly premium payment. Here we have an annual premium payment. So cancellation really doesn't apply. It's just- You decide to non-renew. Why shouldn't we be focused on that non-renewal as opposed to the later non-renewal that you identify on the part of the insurer? Because the contract requires the insured to put it in writing. It can't be thinks it loudly. They have to physically, the insured has to take an actual action of putting a letter in writing to the insurance company saying we're done with this policy. If that doesn't occur, then the company takes it on itself. The company is going to send notice to the insured, the other direction, saying we're no longer insuring you, we're non-renewing the policy. That explicit decision by an insured makes sense in the context of cancellation, which would seem to take place during the term of the policy. But why does it apply with the term non-renewal? The way non-renewal occurs, it's easier, a process. As we know, the policy says there has to be a decision made by the insurance company to non-renew. Here it was a conditional decision. If you do not pay the premium, then we will non-renew the policy and you must pay the premium by February 1st. And we'll accept your money up until midnight, February 1st. If that doesn't happen the next day, we non-renew. As soon as they create the non-renewal, then they affirmatively have to send the notice. That's where they failed. They did not ever send a notice non-renewal. We're even saying one step backward from that, that that 30-day period goes into effect and that the fall occurred within the 30 days. We're not asking for additional extended coverage forever and all that type of thing. And there's case law, by the way, that limits how long the coverage stays in effect when there's a miscommunication like this. It's either the 30-day period or some course will go as far as one year of coverage because that was the policy. But again, the company can then send a notice of cancellation saying, hey, we never got a premium from you and still cancel the policy just so it's all done in writing. That's the only thing that we're talking about, protecting the insured and clarity to the insurance company. I do want to talk about one thing very briefly. To your colleagues, to Mr. Mass' argument that this is not about whether extrinsic evidence comes in or a fact question, this is just a question of law and would be a directed verdict in any event because we're talking about bad faith. I don't agree with him at all. You have to have facts to show that the company lacked a reasonable basis to make a denial. Here, we actually have that evidence. They did an investigation and in their investigation, they said we are denying because notice of removal was provided to the first name insured by the broker. The broker testified under oath, we never provided notice to the first name insured. Therefore, it is a complete lie and fabrication. That is the definition of bad faith that the insurance company investigation results in a 100% actually unsupported premise. It's a complete lie. That is the definition of bad faith in every state in the country and every federal case. And that's a factual issue that has to first come out. Did they lack a reasonable basis to deny the policy? And did they know they lacked a reasonable basis? Well, here we got both. In clear and convincing evidence, we have it both. They lied on the document. They said, oh, this is what occurred. This never actually occurred. So what investigation did they do? We never had discovery in that. Okay, we are, again, over time, I'll ask if either of my colleagues has further questions. I did have one minor point, Your Honor, and this is it. I'll give you just a minute to wrap up. Page 26 of the Applebee's brief, they say we are arguing for a conditional renewal. No, and all their cases talk about conditional renewal, all of them. We're arguing a conditional non-renewal, which is in the policy. In those other cases, conditional renewal is not a term contained in the policy. Black and white difference, just by using NON, changes it entirely, non-renewal versus renewal. Two different scenarios, two different tracks of cases. That PKJK case, irrelevant. It absolutely not, because it's dealing with renewal. We're fighting over a non-renewal, which is in the terms of the policy. In PKJK, they wanted the court to enforce the insurance company to send notice of renewal. We're not asking for that. We're just asking for them to comply with the actual terms of the policy. As your honor, Chang, you stated that, is it only contractual or is it statutory? Case law is either or. We've given cases from all over the country. You can create the non-renewal notice requirement by contract or sometimes by statute. Both are a mechanism, a way to get to the non-renewal issue. So it's not limited only to statute or only the contract. The case law says either or. The cases are interpreted the same way. If it starts with a statute or if it starts with a contract, both are strictly enforced against the insurance company. They must provide the notice of non-renewal. So your honor, you're on the right track with that. Thank you. Thank both parties for briefing and argument and we will take the case under advisement. Thank you.